FILED

2007 May-22  AM 09:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, *et al.*, | ] ] ] | |
| Plaintiffs, | ] ] | CV-05-CO-00596-W |
| vs. | ] ] | |
| SMS-GHH, INC., *et al.* | ] ] | |
| Defendants. | ] | |

## MEMORANDUM OF OPINION

I.      Introduction.

The Court has for consideration defendants SMS-GHH, Inc. and SMS Demag, Inc.'s (hereinafter collectively referred to as "SMS") Motion for Summary Judgment (Doc. 128), which was filed on November 22, 2006. Employers Insurance Company of Wausau (hereinafter referred to as "Employers"), as subrogee of Corus Tuscaloosa, Inc. (hereinafter referred to as "Corus"), filed its complaint on March 21, 2005, asserting claims based upon breach of contract, breach of warranty, negligence, and violations of

the Alabama Extended Manufacturers Liability Doctrine (hereinafter referred to as "AEMLD").  (Doc. 1.)  Employers amended its complaint (Doc. 53) on December 8, 2005, to include Tuscaloosa Steel Corporation d/b/a Corus Tuscaloosa, Inc. as a party plaintiff in this action.[1]  The issues raised in the defendants' motion have been briefed by the parties and are now ripe for decision.  Upon full consideration of the legal arguments and evidence presented, the motion is due to be granted in part and denied in part.

II.    Facts.[2]

In connection with expanding its then-existing steel manufacturing operations, in December 1994, Corus contracted with SMS Demag, Inc., then SMS Concast, Inc., for the design, manufacture, and installation of a single strand continuous slab caster, which was completed in 1996 and accepted in 1997.  At the time of the contract, Tuscaloosa Steel Corporation was a

---

[1] This Court dismissed Corus's AEMLD and negligence claims on July 12, 2006.  Therefore, Corus's only remaining claims are for breach of contract and breach of warranty.

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, the facts submitted in the parties' Joint Status Report, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

division of British Steel, and British Steel employee Roy Knights acted as project manager and contract engineer, responsible for managing the contract, overseeing the caster system installation, and approving milestone payments.   On December 20, 1994, SMS and Corus entered into a $24,433,300.00 contract for SMS to "design, manufacture, supply, deliver, and supervise the erection and commissioning" of a "single strand continuous casting machine" at Corus's Tuscaloosa facility.  SMS had no responsibility for supplying to Corus the ladles, slide-gates, or shrouds.  On October 2, 1996, Corus issued a "Takeover Certificate," and on March 12, 1997, an "Acceptance Certificate" was issued.  The warranty period, or "Defects Liability Period," ran from October 2, 1996, to October 2, 1997.

On March 21, 2003, at approximately 9:55 p.m., a ladle of molten steel was rotated into the caster area.  The ladle was being used for the first time since it had been re-lined with refractory and fitted with a refurbished slide-gate. Ladle man Robby Grant swung the ladle into position to begin the steel-manufacturing process.  Once Grant aligned the ladle, team leader Jeff Morrow, standing on the tundish car, used the shroud manipulator arm to connect the tube-like shroud to the slide-gate on the

bottom of the ladle.  After Morrow attached the shroud to the slide-gate nozzle, Grant then activated a hydraulic switch to open the slide-gate, thereby allowing molten steel to flow from the ladle, through the slide-gate and shroud, and into the tundish, located directly below the ladle.  After less than a minute, a "blowback" occurred.  A blowback can occur for several reasons, including when an obstruction clogs the shroud or slide-gate opening, creating pressure and forcing air upwards in the shroud.  After the blowback, Grant attempted to close the slide-gate, but he could not do so. Therefore, Grant and Morrow attempted to activate the emergency rotate system, rotating the ladle to a spill trough to direct the uncontrolled flow of steel to an emergency ladle.  At the same time, Corus employee Tim Nelson went to a different remote operator's station where he depressed the "Emergency Clear" button, which was also designed to rotate the ladle turret to the emergency spill trough.  Although the ladle began to rotate, it stopped before reaching the emergency spill trough.  Approximately one hundred fifty tons of molten steel spilled onto the caster system, causing Corus to shut down production for approximately twelve days.

At the time of the accident, Corus had a business property insurance

policy with Employers.  The policy had a $550,000.00 deductible.  On March 26, 2003, Employers sent Philip White to inspect the scene of the accident and retain a cause and origin investigator, a certified public accountant to calculate Corus's damage, and a law firm to coordinate the subrogation investigation.  In its "official" investigation report, Corus concluded that the spill resulted from two separate events: the blowback followed by the ladle stopping before reaching the emergency spill trough.  Corus further concluded that "[e]limination of either of these events and there would have been minimal or no damage to the caster."  Corus was unable to determine the cause of the blowback.  It argues that it is impossible to pinpoint the source or cause of a blowback because the evidence involved is inside the closed system full of molten steel.

Employers filed this subrogation action on March 21, 2005, seeking $2,335,581.00 in property and business interruption damages.  Subsequently, Corus joined this action seeking recovery of its $550,000.00 deductible, and on July 12, 2006, this Court dismissed Corus's AEMLD and negligence claims as untimely.

III.    Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or

by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   Discussion.

      A.   Breach of Contract and Breach of Warranty Claims.

SMS argues that it is entitled to summary judgment on Employers' breach of contract and breach of warranty claims because such claims are barred by the applicable statute of limitations.

      1.   Statute of Limitations for Breach of Contract.

In Alabama, a breach of contract claim is subject to a six year statute of limitations under Ala. Code § 6-2-34(9); however, SMS contends that Employers' breach of contract claim is in actuality a claim for breach of a contract for the sale of goods, which must be commenced within four years after the cause of action has accrued.  Ala. Code § 7-2-725(1).  In order for

the four year limitations period to apply, the "continuous caster system" must meet the statutory definition of a "good" as defined by the Uniform Commercial Code, adopted by Alabama, and codified at Ala. Code § 7-2-105. According to the Code,

> "Goods" means all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty.

Ala. Code § 7-2-105(1).  Employers argues in its response brief that a continuous steel caster "is a massive apparatus, more accurately described by SMS's VP of Engineering as a 'plant' rather than as a machine."  (Doc. 151, p. 14.)  According to Michael Poran, an expert for SMS, once erected, the caster becomes "part of the landscape."  *Id*.  SMS responds by pointing to language throughout the agreement with Corus which states that SMS, the "Supplier," shall "design, manufacture, supply, deliver, and supervise the erection and commissioning and make good during the . . ." warranty period the "single strand continuous casting machine."  (Doc. 128, Exhibit 2, p. 2.)

SMS believes that the use of the word "machine" is evidence that the parties to the agreement contemplated that the caster was a good, and, therefore, that the Uniform Commercial Code would provide the applicable statute of limitations.  (Doc. 149, p. 5.)

"Goods" under the UCC may include "things attached to realty."  Ala. Code § 7-2-105(1).  In order to determine whether the caster is a "good," the Court must determine whether it is "capable of severance without material harm to the realty."  Paragraph 1, Official Comment to Ala. Code § 7-2-105; *Keck v. Dryvit Systems, Inc.*, 830 So. 2d 1, 8 (Ala. 2002).  "Thus, in order to be considered a product within the meaning of the UCC, the [caster] must be capable of severance from the [Corus facility] without causing material harm to the [facility]."  *Id.* (finding that an exterior insulation finishing system "loses its distinct characteristic as a 'good' and becomes an integral part of the structure" of a home and that removal of the system would damage the underlying sheathing and overall structural integrity of the house).  Other than blanket assertions that the caster either is or is not a "good" as defined by the UCC, the parties have not presented sufficient evidence for this Court to determine whether the removal of the

machine would or would not cause material harm to the facility.  There is a genuine issue of fact as to whether the caster is a "good" such that the UCC's four year statute of limitations would apply to this case.

Alternatively, Employers urges the Court to apply the statute of limitations found at Ala. Code § 6-5-221, which provides a two year limitation on the commencement of actions against architects, engineers, and builders.  (Doc. 138, p. 15.)  The limitations period does not expire until "two years next after a cause of action accrues or arises, and not thereafter . . .," and the cause does not accrue "until the time of injury or damage . . . or where latent or by its nature not reasonably discovered does not commence until the time of discovery."  Ala. Code §§ 6-5-221, 225.  Ala. Code § 6-5-220 *et seq*. deals with actions against architects, contractors, and engineers.  According to the Code, an engineer is:

> Any individual who, at the time the engineering services were performed, was legally qualified to practice engineering and held an unexpired registration as a professional engineer in the State of Alabama; any individual who, at the time the engineering services were performed, was legally qualified to practice engineering and was certified as an engineer-in-training in the State of Alabama; any partnership, firm, or corporation which, at the time the engineering services were performed, was

> legally qualified to practice engineering and held an
> unexpired certificate of authorization to practice
> engineering in the State of Alabama; and all employees or
> agents of the registered engineer or of his or her entity or
> firm acting under the instruction, control, or supervision
> of the registered engineer.

Ala. Code § 6-5-220(c).  An "improvement on or to real property" includes

"[a]nything that is constructed on or to real property, whether on, under,

or over land or water, that enhances the value of real property permanently

for general uses, including, without limitation, buildings, structures,

fixtures, . . . machinery, equipment and other improvements, and any

extension, alteration, addition, or portion thereof."  Ala. Code § 6-5-220(g).

Employers contends that "[i]n the present matter, it is undisputed that

SMS contracted to design, manufacture, supply, deliver, and supervise the

erection and commissioning of the single strand continuous casting machine

at Corus."  *Id.*  Sections 23.2 through 23.8 of Schedule Seven of the

Agreement between Corus and SMS provides that SMS "shall furnish the

services of a Field Service Engineer upon sufficient advance notice from

[Corus], to approve installation, supervise start-up, and instruct [Corus's]

personnel in the operation and maintenance of the Plant."  Furthermore,

Employers offers that the continuous caster system "would clearly fit within" the definition of an improvement on or to real property. (Doc. 138, p. 16.)

"A party claiming the benefits of a statute has the burden of establishing a sufficient factual basis to support invocation of the statute." *Burkes Mech., Inc. v. Ft. James-Pennington, Inc.*, 908 So. 2d 905, 911 (Ala. 2005) (declining to apply Ala. Code § 6-5-220, *et seq.*, where the party failed to present evidence that it was an Alabama-licensed "builder").  As noted by SMS in its reply brief, in the case at hand, Employers has presented no evidence that SMS or any agents acting on behalf of SMS met the definition of engineer under the statute.  Employers cannot seek to avail itself of the benefits of Ala. Code § 6-5-220, *et seq.*, without first presenting evidence that SMS acted as an engineer *and* met the statutory definition for an engineer under the Code.[3]

---

[3]SMS pointed out in its reply brief that even if Employers is correct and Ala. Code § 6-5-221 applies in this case, then Corus's remaining claims for breach of contract and breach of warranty are time-barred.  The accident at issue in this case occurred on March 21, 2003, Plaintiff Employers filed its original complaint on March 21, 2005, and Corus joined this suit on December 8, 2005.  Therefore, Corus filed its claims after the statute of limitations would have expired under Ala. Code § 6-5-221.

For these reasons, a genuine issue of fact remains as to whether Plaintiffs' breach of contract claims are governed by either the four year statute of limitations found in Ala. Code § 7-2-725(1), under which Employers' claims would be time-barred, or the two year statute of limitations in § 6-5-221, under which Employers' claims may not be barred. Therefore, SMS is not entitled to summary judgment as to Plaintiffs' breach of contract claims.

        2.    Statute of Limitations for Breach of Warranty.

Under the UCC, as adopted by Alabama, "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." Ala. Code § 7-2-725(2). SMS offers that Plaintiffs' breach of warranty claim accrued no later than October 2, 1997. (Doc. 129, p. 15.) The agreement between Corus and SMS, provided for a "Defects Liability Period" which stated that SMS "shall be responsible for . . . any defect or damage . . . arising from defective design . . . materials or workmanship, or any act or omission of [SMS] done

or omitted during the Defects Liability Period." (Doc. 128, Exhibit 2.) Corus' issuance of the "Takeover Certificate" triggered the start of the Defects Liability Period, which expired on October 2, 1997. Roy Knights, manager for projects and strategy for Corus, affirmed at his deposition that the "period for which SMS would have been obligated under the contract for problems with the continuous caster and its components would run from October 2, 1996, up to and including October 2, 1997." (Doc. 128, Exhibit 3, pp. 127-28.) Therefore, SMS contends that it breached its warranty, if at all, and the cause of action accrued on October 2, 1997. Plaintiffs did not file this action until March 21, 2005, four years after the limitations period would have expired if SMS is correct.

Employers argues that even if the four year statute of limitations under the UCC applies to this case, "the promise of future performance tolled the accrual of a cause of action for breach of warranty until the problem was discovered on March 21, 2003." (Doc. 138, p. 16.) There are two exceptions to the rule that a breach of warranty action must be brought within four years of tender of delivery: (1) where the warranty "explicitly extends to future performance of the goods," and (2) where damages are

injury to the person in the case of consumer goods.  *See* Ala. Code § 7-2-725(2).  The contract must "explicitly" extend to future performance in order to fall within the future performance exception.  *See Wright v. Cutler-Hammer, Inc.*, 358 So. 2d 444, 445 (Ala. 1978).  Employers cites to Section 15.0(I)(1.0) of the agreement which states as follows: "SMS Concast guarantees that the casting machine, when installed according to Vendor's specifications, will function according to the Technical Specifications, and the following parameters are further subject to a special demonstration to satisfy this guarantee." (Doc. 128, Exhibit 2.)  If this provision was intended by the parties to warrant that the continuous casting system would continue to operate trouble-free for an indefinite but reasonable time, then it may be deemed to be a promise of future performance tolling the accrual of the limitations period.  *See, e.g., Insurance Company of North America v. ABB Power Generation, Inc.*, 925 F. Supp. 1053 (S.D.N.Y. 1996).  However, the Defects Liability Period referenced above makes no mention of the statement in Section 15.0.

A simple "repair and replace" warranty merely provides a remedy if the product becomes defective.  *See Tittle v. Steel City Oldsmobile GMC*

*Truck, Inc.*, 544 So. 2d 883, 889 (Ala. 1989).  By contrast, a warranty for

future performance guarantees the performance of the product for "a stated

period of time."  *Id*.  The provision quoted by Employers states that the

continuous caster "will function according to the Technical Specifications,"

but it does not contain a stated period of time for performance.  In fact, it

could go on indefinitely.  Moreover, the subject provision is anything but

"explicit."   It states that the caster will perform according to certain

specifications, none of which are at issue in this case.

The Court agrees with SMS that the clause reads as a condition

precedent and not as a warranty for future performance when read in

conjunction with the entire agreement.  (Doc. 149, p. 9.)   A condition

precedent is a fact, other than the lapse of time, that, unless excused, must

exist or occur before a duty of immediate performance of a promise arises.

*Gamble v. Corley, Moncus & Ward, P.C.,* 723 So. 2d 627, 631 (Ala. 1998).

Whether a certain contract provision is a condition precedent depends upon

the intent of the parties to be deduced from the instrument as a whole.

*Fidelity & Cas. Co. of N.Y. v. DeLoach*, 195 So. 2d 789, 793 (Ala. 1967).

Based upon the contract as a whole and the testimony of Roy Knights, the

subject provision appears to relate to the quality of the steel manufactured by the caster, as well as certain "performance-related parameters." (Doc. 128, Ex. 3, pp. 102-03.)  Thus, once SMS completed certain "acceptance tests" demonstrating that the caster performed "as per the identified guarantees within the contract," Corus would issue an "Acceptance Certificate." *Id.* at 117-18.  Corus did issue such a certificate on March 12, 1997.  If SMS had not met the requisite "performance Guarantees" set out in section 15.0 of the agreement, it would not have issued the certificate. Under Alabama law, a party can limit its warranty coverage, and, in this case, SMS limited its coverage to the repair and replace warranty during the Defects Liability period.  *See, e.g., Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997); *Desouza v. Lauderdale*, 928 So. 2d 1035, 1044 (Ala. Civ. App. 2005); Ala. Code § 7-2-719.  For these reasons, it does not appear to the Court that the quoted provision was intended to be a warranty for future performance.

SMS is not entitled to summary judgment as to Plaintiffs' claims for breach of warranty because a genuine issue of material fact remains as to whether the caster is a "good" under the UCC.  However, because the Court

is of the opinion that SMS did not extend a warranty for future performance, if the caster is found to be a "good" then the four year statute of limitations applies and Employers' claims accrued no later than October 2, 1997, the date of expiration of the Defects Liability Period.

      B.      AEMLD and Negligence Claims.

           1.      Economic Loss Doctrine.

      SMS contends that the economic loss doctrine bars Employers' AEMLD and negligence claims.[4]  Under this doctrine, a cause of action does not arise under the tort theories of negligence, wantonness, strict liability, or the AEMLD where a product malfunctions or is defective and thereby causes damage only to the product itself.  *See Ford Motor Co. v. Rice*, 726 So. 2d 626, 631 (Ala. 1998); *Wellcraft Marine v. Zarzour*, 577 So. 2d 414, 418 (Ala. 1991).  SMS contends that Employers' AEMLD and negligence claims are based on property damage that the continuous caster system caused only to itself.  (Doc. 129, p. 17.)  However, as noted by Employers, the undisputed facts of this case demonstrate that damage occurred to more than just the

---

[4] This Court dismissed Corus' AEMLD and negligence claims on July 12, 2006.  Therefore, only Employers' AEMLD and negligence claims remain.

caster itself.  Molten metal caused damage to the caster system as well as the adjacent building structure.  Specifically, the upper cast deck, a portion of the intermediate cast deck, the wall behind the spray chamber, and the flooring in place to support the caster suffered damage.  (Doc. 151, Ex. 11.)

        2.     Plaintiffs' Burden of Proof Under the AEMLD.

SMS argues that Employers cannot meet its burden of proof for its defective design claims under the AEMLD because it cannot prove either the existence of a safer, practical alternative design or that the design defect proximately caused the accident.  (Doc. 129, p. 17.)

        a.     Alternative Design.

To assert an AEMLD claim, a plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the product.  *See Beech v. Outboard Marine Corp.*, 584 So. 2d 447, 450 (Ala. 1991).  The existence of a safer, practical, alternative design must be proved by showing the following: (1) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and (2) taking into consideration such factors as the intended use of the product, its styling, cost, and desirability, its safety

aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighs the utility of the design actually used.  *Id*. at 450.  Expert testimony is not always required in AEMLD cases.  *See Goree v. Winnebago Industries, Inc.*, 958 F.2d 1537, 1541 (11th Cir. 1992) (holding that "[w]hile [expert] testimony may be necessary when the product alleged to be defective is complex and technical in nature, expert testimony is not required when a jury could reasonably infer from the product's failure 'under all the attendant circumstances' that its defective condition caused the plaintiff's injury.") (quoting *Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So. 2d 1328 (Ala. 1991)).  *But see Verchot v. General Motors Corp.*, 812 So. 2d 296, 303 (Ala. 2001) (requiring expert testimony in a case involving an alleged brake failure due to a defect in the master cylinder).

Employers urges the Court to find that expert testimony is not needed. (Doc. 151, p. 22.)  The Court disagrees.  Unlike *Goree*, where the plaintiff was injured because the temperature above the floorboard rendered the

motor home unreasonably dangerous so that it did not meet the reasonable expectations of the ordinary consumer, Corus is not an ordinary consumer. Further, the operation of a single strand continuous slab caster is not a topic about which the ordinary consumer has any knowledge or experience. Therefore, Employers is required to support its AEMLD claim with expert testimony.

### (1)    Johnny Cmaidalka.

SMS argues that Employers' expert, Johnny Cmaidalka, failed to offer an alternative design for the emergency electrical system.  (Doc. 129, p. 19.)  Cmaidalka testified that the emergency rotate system for the caster should have been designed to run on 120 volts rather than the as-designed 24 volts.  (Doc. 128, Ex. 23, pp. 68-74, 87-88; Ex. 27, p. 2.)  However, he could not confirm that Corus's injuries would have been eliminated or reduced by the use of 120 volts.  *Id.* at Ex. 23, p. 88.  Also, he could not confirm that the utility of his suggested design was greater than the design of SMS.  As noted by SMS, Mr. Cmaidalka: (1) had never designed an electrical system for a continuous caster; (2) was unaware of a continuous caster incorporating 120 volts; (3) could not cite to articles, treatises, or

industry standards recommending the use of 120 volts over 24 volts; and (4) admitted that his suggested design was no safer than SMS's. *Id*. at Ex. 23, pp. 79-91. Moreover, Cmaidalka did not attempt to design an electrical system for SMS's caster which utilized 120 volts. *Id*. at 90-91.

Cmaidalka testified that the electrical signal in the emergency rotate system had to travel through too many switches before reaching its destination; however, he also indicated that this criticism did not amount to a defect in the system, but that it simply was not the best design. *Id*. at 95-96, 113-14; Ex. 27, p. 2. Cmaidalka could not confirm that Corus's injuries would have been eliminated or reduced by a different circuit design. *Id*. Ex. 23, pp. 106, 112, 115-17.

Cmaidalka suggested that each of the electrical controls for the emergency system should have been independently routed. *Id*. at 123-25; Ex. 27, p. 2. Once again, however, he could not confirm that Corus's damages would have been eliminated or reduced by a different design. *Id*. at Ex. 23, p. 132-34. Cmaidalka failed to review or even ask for all of the relevant diagrams to the SMS electrical system, and he failed to create an alternative layout for the electrical routing. *Id*. at 11, 121-23, 131-34.

Relying on the standards set out in the cases of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Alabama Supreme Court has held that "[m]ere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony" in an AEMLD case.  *Slay v. Keller Indus.,Inc.*, 823 So. 2d 623, 625-26 (Ala. 2001).  Cmaidalka's testimony appears to the Court to be nothing more than an assertion of his belief that 120 volts is preferable to 24 volts, that an electrical signal in the system had to travel through too many switches, and that the electrical controls should have been independently routed.  Therefore, his testimony would not assist the trier of fact in finding that either SMS's design was defective or that there was a safer, practical alternative design.  *See Beech*, 584 So. 2d at 450.

(2)    Karl Koenig.

Karl Koenig testified that the shroud manipulator was defective because it remained engaged to the ladle and would not clear the ladle when it rotated.  (Doc. 128, Ex. 26, pp. 2-4; Ex. 28, pp. 280-85.)  Koenig proposed a "hydraulic pressure release of one type or another" as a

solution.  *Id.* at  Ex. 28, pp. 280-81.  SMS noted that Koenig did not include this suggested design change in his expert report nor could he identify a single caster manufacturer that incorporated his recommended design.  *Id.* at Ex. 26; Ex. 28, pp. 280-85.  Furthermore, Koenig admitted that he had not prepared, designed, tested, or performed any calculations supporting his proposed "hydraulic pressure release of one type or another." *Id.* at 28, pp. 280-85.  Therefore, while Koenig's testimony as to the defective shroud manipulator is helpful to the trier of fact, his testimony as to the proposed solution is nothing more than an "assertion[] of belief, without any supporting research, testing, or experiments . . . ." *Slay*, 823 So. 2d at 625-26.

Like Cmaidalka, Koenig's testimony does not establish that there is a safer, practical alternative design.

Because the Court finds that expert testimony is necessary to prove Employers' AEMLD claim and that Employers' experts fail to provide the testimony necessary to support its claims, SMS is entitled to summary judgment as to Employers' claims arising under the AEMLD.

C.      Spoliation.

SMS argues that "[k]nowing that litigation over the March 21, 2003, accident was imminent, the Plaintiffs nevertheless allowed critical evidence to be destroyed."  (Doc. 129, p. 25.)  "Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary."  *Vesta Fire Ins. Co. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 93 (Ala. 2004) (quoting *May v. Moore*, 424 So. 2d 596, 603 (Ala. 1982)). Generally, where the trier of fact finds a party guilty of spoliation, it is authorized to presume or infer that the missing evidence reflected unfavorably on the spoliator's interests.  *Id.* (citing *McCleery v. McCleery*, 200 Ala. 4 (1917)).  "Spoliation 'is sufficient foundation for an inference of [the spoliator's] guilt or negligence.'" *Id.* (quoting *May*, 424 So. 2d at 603).

Alabama courts have consistently employed a five factor analysis in considering the appropriate sanction for spoliation of evidence: (1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal.  *Story v. RAJ Properties, Inc.*,

909 So. 2d 797, 802-03 (Ala. 2005) (citing *Vesta Fire*, 901 So. 2d at 94-95). "In a case of classic spoliation, the offending party purposefully and wrongfully destroyed evidence he knew was supportive of the interest of his opponent." *Story*, 909 So. 2d at 804 (internal quotations omitted).

To the extent that spoliation is an issue in this case, it will be addressed at trial by the trier of fact. If the jury finds that Plaintiffs purposefully destroyed the evidence in question it may, but is not required to, infer that the evidence was contrary to their interests. Therefore, SMS is not entitled to summary judgment based on Plaintiffs' alleged destruction of evidence.

V.    Conclusion.

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 128) is due to be GRANTED IN PART and DENIED IN PART. SMS is entitled to summary judgment as to Employers' claims arising under the AEMLD. A separate order in conformity with this opinion will be entered contemporaneously herewith.

Done this 21st day of May 2007.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153